FIFTH DIVISION

No. 1-05-3202

|  |  |  |
|---|---|---|
| | ) | |
| ALISON MILLER and TODD PARRISH, | ) | Appeal from the |
| Individually and as Special Administrator | ) | Circuit Court of |
| of the Estate of Baby Miller-Parrish, | ) | Cook County |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN INFERTILITY GROUP of | ) | |
| ILLINOIS, S.C., d/b/a The Center for Human | ) | |
| Reproduction Illinois, | ) | Honorable |
| | ) | Jeffrey Lawrence, |
| Defendant-Appellant. | ) | Judge Presiding. |

MODIFIED UPON DENIAL OF PETITION FOR REHEARING

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

This case appears before us on interlocutory appeal pursuant to Supreme Court Rule 308

(155 Ill. 2d R. 308) to consider the question certified by the circuit court.

In 2000, plaintiffs Alison Miller and Todd Parrish underwent attempted *in vitro*

fertilization (IVF) at defendant American Infertility Group of Illinois, S.C., d/b/a The Center for

Human Reproduction Illinois (Center). The defendant Center, however, did not cryopreserve the

resulting blastocyst for future use.

*Cryopreservation* refers to "[m]aintaining the viability of an embryo, spermatozoa, or

excised tissues or organs through the use of extremely low temperatures." 2 J. Schmidt,

Attorneys' Dictionary of Medicine C-510 (2007). A *blastocyst* refers to a:

"very early form of embryo. It consists of a thin trophoblast (a thin 'shell' composed of layers of cells), the inner cell mass (a clump of multiplying cells), and a blastocoele [or a fluid-filled interior of the mass of cells that results from the cleavage and proliferation of fertilized ovum]." 1 J. Schmidt, Attorneys' Dictionary of Medicine B-134 (2007).

An *embryo* refers to:

"[t]he fetus in its earlier stages of development. The embryo is the product of conception for the first three months; after that time it is called the fetus."

Medical Dictionary for Lawyers 266 (3d ed. 1960).

See also 2 J. Schmidt, Attorneys' Dictionary of Medicine E-67 (2007) ("embryo - The product of pregnancy (i.e., the infant growing in the uterus) in the early period of its development, especially in the first two months. After the end of the second month it is called *fetus*").

In 2003, plaintiffs and Todd Parrish as special administrator of the estate of Baby Miller-Parrish filed a three-count amended complaint that set forth negligence, battery and breach of contract causes of action. Each count sought recovery of damages under the Wrongful Death Act (740 ILCS 180/0.01 *et seq*. (West 2002)). Specifically, the complaint alleged that: an IVF performed on January 7, 2000, resulted in nine viable embryos, one of which developed into a healthy blastocyst that was to be cryopreserved for future implantation; on or about January 13, 2000, defendant failed to properly cryopreserve the blastocyst; and plaintiffs were not informed of the failed cryopreservation until June 21, 2000, when they contacted defendant to have their

blastocyst transferred to another center.

Defendant filed a motion to dismiss pursuant to section 2-615 of the Illinois Code of Civil Procedure (735 ILCS 5/2-615 (West 2002)), arguing that the Wrongful Death Act did not create a cause of action for the loss of a blastocyst created by IVF and not yet implanted within the IVF patient's uterus. Specifically, defendant argued that section 2.2 of the Wrongful Death Act applied only to the loss of a fetus, *i.e.*, an intrauterine pregnancy.

Section 2.2 of the Wrongful Death Act provides, in pertinent part:

"The state of gestation or development of a human being when an injury is caused, when an injury takes effect, or at death, shall not foreclose maintenance of any cause of action under the law of this State arising from the death of a human being caused by wrongful act, neglect or default." 740 ILCS 180/2.2 (West 2006).

Initially, the circuit court granted defendant's motion and dismissed plaintiffs' wrongful death claims. Ultimately, however, the circuit court granted plaintiffs' second motion to reconsider and reinstated their wrongful death claims, holding that a "pre-embryo is a 'human being' within the meaning of Sec. 2.2 of the Wrongful Death Act and that a claim lies for its wrongful destruction whether or not it is implanted in its mother's womb." The circuit court used the term *pre-embryo* as it is defined in the Gestational Surrogacy Act (750 ILCS 47/10 (West 2006)), *i.e.*, "a fertilized egg prior to 14 days of development." The circuit court denied defendant's motion to reconsider that ruling, but certified the following question for review on interlocutory appeal:

1-05-3202

"Does Section 2.2 of the Illinois Wrongful Death Act (740 ILCS 180/2.2) allow a cause of action or recovery under the Act for loss of an embryo created by *in vitro* fertilization that has not been implanted into the mother?"

For the reasons that follow, we answer the certified question in the negative.

ANALYSIS

We review the legal questions presented on interlocutory appeal *de novo*. Bajalo v. Northwestern University, 369 Ill. App. 3d 576, 580 (2006). When reviewing certified questions under Rule 308, we only answer the certified questions posed. We do not render an opinion or rule on the propriety of any underlying order of the trial court. Applebaum v. Rush University Medical Center, 376 Ill. App. 3d 993, 995 (2007).

We review issues of statutory construction *de novo*. In re Marriage of Saputo, 363 Ill. App. 3d 1011, 1013 (2006). Illinois law is clear:

"The primary rule of statutory construction is to ascertain and give effect to the intention of the legislature. The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. The statute should be evaluated as a whole, with each provision construed in connection with every other section. [Citations.] When the statutory language is clear, no resort is necessary to other tools of construction. [Citations.] Where the meaning of a statute is ambiguous, courts may look beyond the statutory language and consider the purpose of the law, the evils it was intended to remedy, and the legislative history of the statute. [Citations.]" Cinkus v. Village of Stickney

4

1-05-3202

, 228 Ill. 2d 200, 216-17 (2008).

The Wrongful Death Act provides for recovery for the death of a person by a wrongful act. 740 ILCS 180/1 (West 2006). As a requirement for a wrongful death action, the decedent must have had the potential, at the time of death, to maintain an action for personal injury against the defendant. Williams v. Manchester, 228 Ill. 2d 404, 423-24 (2008); Varelis v. Northwestern Memorial Hospital, 167 Ill. 2d 449, 454-55 (1995). A cause of action for the wrongful death of a person did not exist at common law, so the Wrongful Death Act is the statutory source for determining who may sue and under what conditions. Rallo v. Crossroads Clinic, Inc., 206 Ill. App. 3d 676, 680 (1990). The Wrongful Death Act is in derogation of the common law. Accordingly, it must be strictly construed and nothing is to be read into it by intendment or implication. Williams, 228 Ill. 2d at 419 ("a court will not presume that the legislature intended an innovation of the common law further than that which the statutory language specifies or clearly implies").

In Chrisafogeorgis v. Brandenberg, 55 Ill. 2d 368, 369 (1973), the defendant's vehicle struck the 36-week pregnant plaintiff, and her fetus died from the accident. Our supreme court held that a wrongful death action could be brought for the death of a *viable* fetus within the mother's womb. Chrisafogeorgis, 55 Ill. 2d at 374-75. The court stated that "the appropriate line of demarcation" for allowing a wrongful death claim for an unborn child is "the time at which a child is capable of being delivered and remaining alive separate from and independent of the mother." Chrisafogeorgis, 55 Ill. 2d at 374-75.

5

However, in 1980 our General Assembly amended the Wrongful Death Act by adding section 2.2, which eliminated the viability requirement of <u>Chrisafogeorgis</u>. Section 2.2 provides:

"The state of gestation or development of a human being when an injury is caused, when an injury takes effect, or at death, shall not foreclose maintenance of any cause of action under the law of this State arising from the death of a human being caused by wrongful act, neglect or default.

There shall be no cause of action against a physician or a medical institution for the wrongful death of a fetus caused by an abortion where the abortion was permitted by law and the requisite consent was lawfully given. Provided, however, that a cause of action is not prohibited where the fetus is live-born but subsequently dies.

There shall be no cause of action against a physician or a medical institution for the wrongful death of a fetus based on the alleged misconduct of the physician or medical institution where the defendant did not know and, under the applicable standard of good medical care, had no medical reason to know of the pregnancy of the mother of the fetus." 740 ILCS 180/2.2 (West 2006).

The parties dispute the meaning of the phrase "state of gestation or development of a human being," and the term *human being* is not defined in the Wrongful Death Act. We cannot discern the drafters' intent from the plain language of the statute alone. Consequently, we will go outside the language of section 2.2 and examine its legislative history.

1-05-3202

First, however, we note the guidance provided by the Statute on Statutes. 5 ILCS 70/1 (2006). Specifically, section 1.36 of the Statute on Statutes, which became effective January 2006 and concerns the born-alive infant, provides:

"(a) In determining the meaning of any statute or of any rule, regulation, or interpretation of the various administrative agencies of this State, the words 'person', 'human being', 'child', and 'individual' shall include every infant member of the species homo sapiens who is born alive at any stage of development.

(b) As used in this Section, the term 'born alive', with respect to a member of the species homo sapiens, means the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

(c) Nothing in this Section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being born alive, as defined in this Section.

(d) Nothing in this Section shall be construed to affect existing federal or State law regarding abortion.

(e) Nothing in this Section shall be construed to alter generally accepted medical standards." 5 ILCS 70/1.36 (West 2006).

We now examine the legislative history of section 2.2 of the Wrongful Death Act, which was debated as an amendment in 1979 as Senate Bill 756 (81st Gen. Assem., Senate Bill 756, 1979 Sess.) and became effective January 1, 1980. Although the language of the original bill proposed to cover the state of gestation, development, dependency, capacity or disability, that language was deleted from the bill. In explaining the changes at the second reading of the bill, Senator Mark Rhoads, who sponsored the legislation, stated that the language was deleted to "make it clear that we are only talking about a state of gestation and not other stages of development." 81st Ill. Gen. Assem., Senate Proceedings, May 9, 1979, at 57 (statements of Senator Rhoads).

At the third reading of the bill, Senator Rhoads explained the intent of Senate Bill 756 as follows:

"Basically, there's a lot of case law right now, which indicates that the representative of the unborn child at viability can now bring a cause of action for wrongful death. There is even case law, which deals with preconception. That is where the womb or the blood supply or other injury has been caused to the mother prior to conception and then later an injury has been caused. But, ironically enough, there is no cause of action, at least, statutorily at the moment for any state of gestation [sic], which may be prior to viability. This would close that particular gap in the law and I would ask for a favorable roll call." 81st Ill. Gen.

Assem., Senate Proceedings, May 17, 1979, at 165 (statements of Senator

Rhoads).

When asked whether the effect of the bill was to state in law that abortion was murder,

Senator Rhoads responded that the bill simply stated:

"[T]he state of gestation shall not be . . . will . . . shall not be [*sic*] foreclose a

cause of action on behalf of the unborn child or on behalf of the fetus.  This is

case law now.  Frankly, I feel it's a representation of what . . . of what the law is,

but we don't have any specific cases that deal with gestation prior to viability and

the courts really haven't wanted to define viability.  [W]e've had cases where there

has been injury caused at four and five months into the pregnancy where the

representative of the unborn child has been able to bring a . . . a cause of action for

wrongful death, but from the time of conception to the time of whenever viability

is and nobody knows, ironically, you can sue for injury, but you can't sue for

wrongful death."  81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at

166-67 (statements of Senator Rhoads).

When asked what new cause of action the bill allowed, Senator Rhoads explained:

"The new action or cause of action, which it brings is a cause of action for

the death of the unborn child from the time of conception . . . let's say, for

example, for the three . . . the first three months of pregnancy, whenever . . .

whenever viability would occur.  The case law on that period of time is silent."

81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 167 (statements of

Senator Rhoads).

When asked what was the purpose of the bill, Senator Rhoads responded:

"to close a . . . a gap in the current law, both case law and statutory law covering that period of time from the time of conception to the time of viability. We have case law on viability. We have . . . both for with respect to injury and with respect to wrongful death. We even have case law, which is . . . as I alluded to, preconception case law, if you can imagine that because the mother had been injured and then later conceived and the child was harmed or a death occurred and so forth, but from that period of time from conception to viability, which the courts so far have not . . . have declined to define, there is no cause of action for wrongful death. [T]his bill would close that loophole." 81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 168-69 (statements of Senator Rhoads).

In response to a request for some examples of wrongful death, Senator Rhoads stated:

"Let's say a . . . a pregnant woman in her fourth or fifth or sixth week of pregnancy is harmed through neglect or through default or for some other reason and the unborn child, the fetus is harmed or killed, this bill would let the representative of that fetus bring a cause of action for wrongful death under the Wrongful Death Act." 81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 169 (statements of Senator Rhoads).

In response to a question concerning the state of dependency, Senator Rhoads explained that the original bill, which was amended in committee, referred to:

10

"the state of gestation, development, dependency, capacity or disability. Now, the ACLU objected to that language because they were . . . they envisioned situations where people were on artificial life support machines in a hospital and whereby their own desire . . . let's say a husband told the wife, it is my desire to be pulled off the machine and . . . and so forth and so in order to make it clear that we were simply confining the discussion to the unborn children, we amended that out to make it simply the state of gestation." 81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 172 (statements of Senator Rhoads).

Concerns were raised that the bill might allow attempts to evade United States Supreme Court decisions concerning legal abortions by allowing litigants to sue the doctor or anyone who participated in an abortion. Senator Rhoads responded that the simple purpose of the bill was to cover under the Wrongful Death Act the "period of time covered from the time of conception to the time of viability whenever the . . . whenever that occurs and that the courts have declined so far to define exactly when that is." 81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 174 (statements of Senator Rhoads).

Thereafter, Senate Bill 756 was discussed in the Illinois House of Representatives. An amendment intended to clarify that the bill did not conflict with federal case law concerning lawfully performed abortions was defeated. 81st Gen. Assem., House Proceedings, June 15, 1979, at 35-37. Another amendment sought to require the plaintiff to prove by clear and convincing evidence that the defendant's misconduct was the proximate cause of the fetus's death. Representative Daniels explained that the higher burden of proof would address the

11

problem "that it's too easy to [have a] miscarriage in the first three months of a pregnancy and what we're trying to do is specify that you must show that the death of the fetus was a result or a proximate cause of the action." 81st Gen. Assem., House Proceedings, June 15, 1979, at 38 (statements of Representative Daniels). That amendment was also defeated.

At the second reading of the bill, Representative Cullerton explained that a proposed amendment to the bill would assure that a wrongful death action could not be brought on behalf of an aborted fetus when the abortion was lawful and lawfully performed by a doctor. 81st Gen. Assem., House Proceedings, June 21, 1979, at 131. The amendment would also protect "the doctor who may have caused a fetal death when he had no reason to know the woman was pregnant." 81st Gen. Assem., House Proceedings, June 21, 1979, at 131 (statements of Representative Cullerton). That amendment passed.

At the third reading of the bill, Representative Cullerton discussed the intent of the bill, which allowed:

"for a wrongful death action to be brought for the wrongful death of a nonviable fetus. The present state of the law is that a viable fetus, if there's a wrongful death can . . . its representative can bring a cause of action. And this Bill simply eliminates the distinction between a viable and a nonviable fetus." 81st Gen. Assem., House Proceedings, June 23, 1979, at 65 (statements of Representative Cullerton).

Senate Bill 756 passed the House and returned to the Senate. The Senate concurred with the House's amendment, and bill was declared passed. 81st Gen. Assem., Senate Proceedings,

1-05-3202

June 28, 1979, at 52-53.

The legislative debates surrounding the enactment of section 2.2 discussed extending the cause of action under the Wrongful Death Act to pregnancies involving nonviable fetuses. As Senator Rhoads specified, by such extension the bill sought "to close a . . . a gap in the current law, both case law and statutory law covering that period of time from the time of conception to the time of viability." 81st Ill. Gen. Assem., Senate Proceedings, May 17, 1979, at 168 (statements of Senator Rhoads). *Conception* refers to "[t]he act of becoming pregnant; the fertilization of the egg and the beginning of the growth of the embryo in the body of the mother." Medical Dictionary for Lawyers 187 (3d ed. 1960). See also 2 J. Schmidt, Attorneys' Dictionary of Medicine C-393 (2007) (*conception* - "The impregnation of the female reproductive cell (the ovum) by the male reproductive cell (the spermatozoon)"; *conception, site of* - "Fertilization of the ovum (i.e., conception) normally takes place in a uterine tube, usually near the end that is fimbriated (has finger-like extensions)"). We acknowledge that dictionary definitions of the term *conception* vary. Nevertheless, the legislative debates establish that the discussions concerning coverage under the Wrongful Death Act from the time of conception occurred in the context of a *pregnancy*, *i.e.*, "[t]he condition of a woman having an embryo or fetus in her body, usually in the uterus, lasting from the time of conception to the time of childbirth, abortion, etc." 5 J. Schmidt, Attorneys' Dictionary of Medicine P-403 (2007).

When asked to give examples of the new cause of action that would be allowed under the proposed bill, Senator Rhoads gave examples of only *in utero* pregnancies. Specifically, in defining coverage from conception-to-viability, he referred to the first three months of

13

pregnancy. Later in the debates, he gave as an example of the relevant time period a pregnant woman in her fourth, fifth or sixth week of pregnancy.

In addition, the questions or concerns raised by other legislators during the debates clarified that the scope of section 2.2 concerned *in utero* pregnancies. For example, legislators expressed concerns that the bill should not interfere with legal abortions, and the term *abortion* refers to the premature expulsion of the developing child *from the womb* before it is capable of surviving. See 1 J. Schmidt, Attorneys' Dictionary of Medicine A-26 (2007); Medical Dictionary for Lawyers 5 (3d ed. 1960). Also, Senate Bill 756 was amended to protect physicians and medical institutions from malpractice lawsuits where they did not know and, under the applicable standard of good medical care, had no medical reason to know of the *pregnancy* of the mother. 740 ILCS 180/2.2 (West 2006). Moreover, concerns were raised that the bill should distinguish *pregnancies lost through miscarriage* from those lost by wrongfully caused injuries.

There was no mention of *in vitro* fertilization during the legislative debates. When Senator Rhoads discussed the issue of preconception, his remarks were limited to situations where the mother sustained some injury to her womb or blood supply prior to conception and then her child was injured *in utero* as a result. Senator Rhoads commented that the law provided a cause of action for that type of preconception situation but, ironically, did not allow a cause of action for the fatally injured, nonviable fetus. Furthermore, a question about the state of dependency and the language deleted from the original bill clarified that section 2.2 did not extend to situations involving artificial life support. Rather, the discussion established that the intent of the bill was confined to add a cause of action to the pre-existing law. The new cause of

action would allow recovery under the Wrongful Death Act for fatal injuries to a fetus caused during pregnancy, regardless of whether the fetus was viable or not viable. See Smith v. Mercy Hospital & Medical Center, 203 Ill. App. 3d 465, 471 (1990) (section 2.2 created a cause of action for the wrongful death of a fetus injured any time after conception). The purpose of section 2.2 was simply to eliminate the distinction between a viable and a nonviable fetus.

Because the Wrongful Death Act is in derogation of common law, the court cannot extend the reach of the statute to embrace situations not within the intent of the legislature. The Wrongful Death Act has never been interpreted to apply to situations involving the *in vitro* fertilization process and cryopreservation of blastocysts or pre-embryos. Such a cause of action could only come about through legislative action, not judicial pronouncement.

Thus, it is clear that the legislature's intent in enacting section 2.2 of the Wrongful Death Act was to extend the cause of action to pregnancies in the mother's body regardless of whether the fetus was viable or nonviable. Therefore, we answer *no* to the certified question that asked whether section 2.2 of the Wrongful Death Act allowed a cause of action or recovery under the Act for loss of an embryo created by *in vitro* fertilization that has not been implanted into the mother.

Plaintiffs argue that we should construe section 2.2 of the Wrongful Death Act *in pari materia* with sections 1 and 2 of the Illinois Abortion Law of 1975 (Abortion Law) (720 ILCS 510/1, 2 (West 2006)). Specifically, plaintiffs urge us to rely on the legislature's declaration that "the unborn child is a human being from the time of conception" (720 ILCS 510/1 (West 2006)), and definitions that treated as synonymous the terms *conception* and *fertilization* to mean "the

fertilization of a human ovum by a human sperm, which shall be deemed to have occurred at the time when it is known a spermatozoon has penetrated the cell membrane of the ovum" (720 ILCS 510/2(5) (West 2006)).

"A court presumes that the legislature intended that two or more statutes which relate to the same subject are to be operative and harmonious." Cinkus, 228 Ill. 2d at 218. "A court must compare statutes relating to the same subject and construe them with reference to each other, so as to give effect to all of the provisions of each if possible." Cinkus, 228 Ill. 2d at 218.

The Wrongful Death Act and the Abortion Law are not *in pari materia* but, rather, address different subjects and were enacted for different purposes. Our General Assembly enacted the Abortion Law "to reasonably regulate abortion in conformance with the decisions of the United States Supreme Court of January 22, 1973." 720 ILCS 510/1 (West 2006). Further, the General Assembly intended the Abortion Law to "assure and protect the woman's health and the integrity of the woman's decision whether or not to continue to bear a child, to protect the valid and compelling state interest in the infant and unborn child, to assure the integrity of marital and familial relations and the rights and interests of persons who participate in such relations, and to gather data for establishing criteria for medical decisions." 720 ILCS 510/1 (West 2006).

However, the purpose of the Wrongful Death Act is to compensate the surviving spouse and next of kin for the pecuniary losses sustained due to the decedent's death. Simmons v. University of Chicago Hospitals & Clinics, 162 Ill. 2d 1, 14 (1994). Our General Assembly later enacted section 2.2 to amend the Wrongful Death Act to allow recovery for the loss of the

nonviable as well as the viable fetus. That intent was expressly stated multiple times during the legislative debates of the Wrongful Death Act, and it is improper to look to the Abortion Law to infer any legislative intent. Furthermore, the definitions set forth in section 2 of the Abortion Law were expressly limited to that particular statute. 720 ILCS 510/2 (West 2006)).

Plaintiffs also argue that the legislature's use of the term *development* in the phrase "the state of gestation or development of a human being" of section 2.2 of the Wrongful Death Act demonstrates the legislature's intent to extend wrongful death actions to whatever beings might develop outside the purview of gestation, and necessarily includes beings created by *in vitro* fertilization. Plaintiffs note that when the legislature deleted the terms *dependency*, *capacity* and *disability* from the original bill, it kept the terms *gestation* and *development*. Citing the rules of statutory construction, plaintiffs argue that *development* must not be interpreted in a manner that renders it superfluous.

Plaintiffs' argument is not persuasive. Senator Rhoads clarified that the proposed legislation "only talked[ed] about a state of gestation and not other stages of development." 81st Ill. Gen. Assem., Senate Proceedings, May 9, 1979, at 57 (statements of Senator Rhoads). Moreover, the statutory terms *gestation* and *development* are not redundant. The legislative debates established that the intent of the bill was confined to permit a cause of action under the Wrongful Death Act for the nonviable fetus still in a state of gestation where the pre-existing law already addressed situations involving the viable fetus still in a state of gestation and the born-alive infant at any stage of development. *Gestation* refers to the *in utero* fetus, whereas *development* refers to the live-born fetus or infant.

17

CONCLUSION

For the foregoing reasons, we answer the certified question in the negative. Section 2.2 of the Wrongful Death Act does not allow a cause of action or recovery under the Act for the loss of an embryo created by *in vitro* fertilization that has not been implanted into the mother. We remand the cause to the circuit court.

Certified question answered; cause remanded.

FITZGERALD SMITH, P.J., and TULLY, J., concur.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

ALISON MILLER and TODD PARRISH, Individually and as Special
Administrator of the Estate of Baby Miller-Parrish,

Plaintiffs-Appellees,

v.

AMERICAN INFERTILITY GROUP of ILLINOIS, S.C., d/b/a The Center
for Human Reproduction Illinois,

Defendant-Appellant.

No. 1-05-3202

Appellate Court of Illinois
First District, FIFTH DIVISION

October 24, 2008

Justice Margaret O'Mara Frossard authored the modified opinion of the court:

Presiding Justice Fitzgerald Smith and Justice Tully concur.

Appeal from the Circuit Court of Cook County.
The Hon. Jeffrey Lawrence, Judge Presiding.

**Counsel for Defendant-Appellant**
Cassiday Schade, LLP, Chicago, IL 60606
OF COUNSEL: James W. Kopriva, Brian A. Schroeder and Anthony J. Longo

**Counsel for Plaintiffs-Appellees**
Costello, McMahon & Burke, Ltd., Chicago, IL 60606
OF COUNSEL: James P. Costello and Paul M. McMahon