# Illinois Official Reports

## Appellate Court

---

### *Rojas v. Martell*, 2020 IL App (2d) 190215

---

| | |
|---|---|
| Appellate Court Caption | SANDRA ROJAS, f/k/a Sandra Mendoza, Plaintiff-Appellee, v. SANDRA MARTELL, in Her Official Capacity as Public Health Administrator of the Winnebago County Health Department; JAMES POWERS, in His Official Capacity as Chair of the Winnebago County Board of Health; and WINNEBAGO COUNTY, ILLINOIS, Defendants-Appellants. |
| District & No. | Second District No. 2-19-0215 |
| Filed | March 6, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 16-L-160; the Hon. Eugene Doherty, Judge, presiding. |
| Judgment | Certified questions answered; cause remanded. |
| Counsel on Appeal | Michael J. Atkus and Elizabeth A. Knight, of Knight Hoppe Kurnik & Knight, Ltd., of Rosemont, for appellants. Whitman H. Brisky, of Mauck & Baker, LLC, of Chicago, and Noel W. Sterett, of Dalton Tomich PLC, and Nathan J. Noble, of Nathan J. Noble, P.C., both of Belvidere, for appellee. |

Panel             JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1       This interlocutory appeal arises out of plaintiff Sandra Rojas's former employment as a licensed practical nurse with the Winnebago County Health Department (Health Department). Defendants are Dr. Sandra Martell, the public health administrator of the Health Department; James Powers, the chair of the Winnebago County Board of Health (Board); and Winnebago County. Plaintiff's complaint raises claims under the Health Care Right of Conscience Act (Right of Conscience Act) (745 ILCS 70/1 *et seq.* (West 2014)) and the Religious Freedom Restoration Act (Religious Freedom Act) (775 ILCS 35/1 *et seq.* (West 2014)). Plaintiff alleges that defendants discriminated against her after she asserted that her religious beliefs as a practicing Catholic prevented her from providing birth control, from providing "Plan B" emergency contraception (or "the morning-after pill"), and from making a referral for an abortion.

¶ 2       The trial court denied the parties' cross-motions for summary judgment but granted defendants' motion to certify four questions pursuant to Illinois Supreme Court Rule 308 (eff. July 1, 2017), as set forth below, involving burdens of proof and defenses with respect to Right of Conscience Act and Religious Freedom Act claims. Defendants timely filed an application for leave to appeal in this court pursuant to Rule 308; plaintiff filed an answer in opposition. We granted the application for leave to appeal.

¶ 3                              I. BACKGROUND

¶ 4       The following is derived from the materials set forth in the supporting record and filed in support of the parties' summary judgment motions. Plaintiff began working at the Health Department in 1996 as a part-time licensed practical nurse in the pediatric immunization clinic. In August 2014, plaintiff began working full-time at the Health Department in the areas of adult immunization and phlebotomy, in addition to pediatrics.

¶ 5       Meanwhile, in January 2014, the Board adopted a strategic plan for the Health Department, including an initiative to evaluate opportunities for cross-connection, improved customer service, and consolidation. At the time, the Health Department operated the following eight clinics, located in two separate buildings: pediatric immunization, adult immunization, refugee, blood work, travel immunization, sexually transmitted disease/infection, family planning/women's health, and tuberculosis control. Pursuant to the objectives of the strategic plan, Dr. Martell announced a goal to integrate the eight clinics by June 2015. Toward that end, in January 2015, the nurses in the various clinics were advised that they would be cross-trained to provide all services in the combined clinic, including family planning and women's health services.

¶ 6       In May or June 2015, plaintiff spoke with Kimberly Ponder, Winnebago County's director of human resources, about her discomfort with providing certain family planning and women's

health services, based on her religious beliefs. Ponder directed plaintiff to Dr. Martell, who had the authority to determine whether an accommodation could be provided.

¶ 7 Plaintiff informed Dr. Martell that as a practicing Catholic her religious beliefs prevented her from providing birth control, from providing Plan B emergency contraception, and from making a referral for an abortion. In a June 30, 2015, letter, Dr. Martell responded to plaintiff:

"On June 24, 2015, you approached management at the Health Department requesting a religious accommodation due to the consolidation of duties at the various Health Department clinics which is to occur on July 1, 2015. You are currently working in the Pediatric Immunization Clinic and indicated a preference to stay with pediatrics. You conveyed that your religious beliefs would not permit you to perform a number of the required duties at the combined clinics. Unfortunately, business necessity has compelled the consolidation of the clinics, including the Pediatric Immunization Clinic, requiring cross-training of all employees.

We have diligently considered your request for an accommodation and have determined that we cannot accommodate you within the clinic environment at the Health Department. The terms of the grants that we work under require the nursing staff in the clinics to utilize a non-directed approach with our clients. Frequently, this will involve job duties that you have indicated are objectionable to you. We have determined that we cannot segregate you, as the only full-time Licensed Practical Nurse (LPN), from these job duties without creating an undue hardship for the other employees in the clinics and the Health Department as a whole.

While we cannot accommodate you in the Health Department clinics, we can offer some alternatives outside of the clinics. The first position would be as a temporary part-time food inspector for the Health Department. The second would be as an LPN at River Bluff Nursing Home, which is owned by the County of Winnebago. Should you have any questions or be interested in either of these positions, please let me know and we can assist you or direct you to the appropriate personnel to assist you.

I realize that you have a lot to consider. We will continue to make a temporary accommodation for you for the next fourteen (14) days to give you time to decide what you would like to do. I look forward to your response within that time frame."

¶ 8 Plaintiff did not receive the letter until Dr. Martell provided plaintiff a copy after following up with her about the status of her decision, on July 14, 2015, because the letter was sent to the wrong address. As a result, the response deadline was extended to July 18, 2015.

¶ 9 In a July 14, 2015, e-mail, Dr. Martell informed Ponder that plaintiff "indicated that she would like to consider River Bluff as an option." Dr. Martell also requested information as to "how we can facilitate the process for her to tour/interview/consider the position." Dr. Martell further informed Ponder that plaintiff "wanted to know if she would have to resign or would she be terminated if the option is not acceptable" and that Dr. Martell "essentially informed [plaintiff] that [they] would work through the process with her to consider her options." However, in a July 16, 2015, e-mail, Dr. Martell informed Ponder that plaintiff telephoned her to "verbally indicate[ ] that she has decided not to pursue the accommodations at River Bluff or the food inspector with the Health Department and will submit her 2[-]week letter of resignation to her supervisor Mary Weyand tomorrow."

¶ 10    It was undisputed that plaintiff submitted her resignation on July 17, 2015, effective July 31, 2015. Plaintiff wrote: "Please accept this letter as my formal notice of resignation from Winn. Co. Health Dept effective on 7-31-15. I have enjoyed my employment here and appreciate all [I] have learned[.]"

¶ 11    Plaintiff subsequently sued defendants, alleging Right of Conscience Act and Religious Freedom Act claims. Following a round of unsuccessful summary judgment motions by both sides, defendants again moved for summary judgment, and plaintiff moved for summary judgment on liability. Regarding plaintiff's Right of Conscience Act claim, defendants argued that the framework for analyzing an employment discrimination claim under Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e *et seq.* (2012)) should apply. Accordingly, defendants argued that plaintiff failed to establish a *prima facie* case under the Right of Conscience Act because it was undisputed that she did not suffer an adverse employment action. Moreover, defendants maintained that they were entitled to summary judgment because they offered plaintiff a reasonable accommodation, which plaintiff failed to pursue, and that allowing plaintiff to remain in her position would have amounted to an undue hardship on their business.

¶ 12    Noting the dearth of authority on the issue, the trial court applied principles of statutory construction in rejecting the application of the Title VII framework to the Right of Conscience Act claim. As such, the trial court pointed out that the legislature did not expressly adopt a Title VII analysis for claims under the statute. Rather, "the legislature has plainly stated [(in the Right of Conscience Act)] that it 'shall be unlawful' to 'discriminate against any person *** because of such person's conscientious refusal to participate in any particular form of health care services contrary to his or her conscience,' and it further described that an act of discrimination includes a 'transfer' made due to the employee's invocation of an objection of conscience." Thus, the court concluded, "[r]egardless of the wisdom of that decision, it is not the [c]ourt's place to engraft upon the statute a provision which the legislature could have included but did not." The court nevertheless noted its concern with plaintiff's analysis in that the act of purportedly transferring plaintiff to accommodate her conscience-based objection would be the very act that would establish defendants' liability under the Right of Conscience Act.

¶ 13    The trial court rejected plaintiff's argument that liability was established as a matter of law. The court found genuine issues of material fact as to the purported transfer. The trial court concluded that a reasonable inference may be drawn from the record that defendants "would not have forced [p]laintiff off her job if the hoped-for alternative positions were unavailable or unacceptable." The court also concluded that the "record permits more than one inference about whether the alternative job possibilities were being offered to [p]laintiff, or whether she would ultimately be *required* to choose one of them (or give up her job)."

¶ 14    Regarding plaintiff's Religious Freedom Act claim and whether plaintiff was prevented from exercising her religious beliefs, the trial court found both parties' arguments to be essentially a "rehash" of their positions with respect to the Right of Conscience Act claim. Namely, defendants argued that plaintiff was not prevented from honoring her religious beliefs because she was accommodated at work for an initial time period and the availability of alternative positions was never fleshed out. The court found that the "matters presented here are clearly reflective of a question of fact, as the record permits different inferences about whether [p]laintiff was effectively required to leave her job or whether she voluntarily left

- 4 -

without fully exploring alternatives." Likewise, the court found genuine issues of material fact with respect to whether Dr. Martell's letter was the equivalent of a discharge from the clinic and whether plaintiff was offered other viable and comparable alternatives.

¶ 15 However, defendants also argued that they did not substantially burden plaintiff's free exercise of religion in the first instance because, as a public employee, plaintiff had no legitimate expectation of remaining in her preferred position. The trial court flatly rejected the argument, finding it "extremely disappointing to see [d]efendants make an argument which seems to have such a weak basis in law or fact." The trial court queried: "Are [d]efendants effectively rewriting [the Religious Freedom Act] so as to make it inapplicable to public employees, all of whom have 'no legitimate expectation' of continued employment? Better judgment would have led [d]efendants to have foregone this argument." As a final matter with respect to the Religious Freedom Act claim, the court concluded that there were genuine issues of material fact with respect to whether defendants had a compelling interest in having plaintiff perform the objected-to services as part of her job responsibilities and whether they employed the least restrictive means to serve the purported compelling governmental interest. Accordingly, the trial court denied the parties' cross-motions for summary judgment.

¶ 16 The trial court subsequently granted defendants' motion to certify the following questions pursuant to Rule 308:

"1. Is an employee making a claim of discrimination under the [Right of Conscience Act] required to prove an adverse employment action, as traditionally required in Title VII actions?

2. If an employee contends that a job duty violates their [*sic*] right of conscience under the [Right of Conscience Act], does a transfer of that employee to a job which does not include the objected-to duty necessarily violate the following provision:

It shall be unlawful for any person, public or private institution, or public official to discriminate against any person in any manner, including but not limited to, licensing, hiring, promotion, *transfer*, staff appointment, hospital, managed care entity, or any other privileges, because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience. [745 ILCS 70/5 (West 2014).]

3. Is 'reasonable accommodation,' as that term is used under Title VII, a defense to a claim under the [Right of Conscience Act]?

4. Is 'reasonable accommodation,' as that term is used under Title VII, a defense to a claim under the [Religious Freedom Act]?" (Emphasis added.)

¶ 17 We granted defendants' application for leave to appeal pursuant to Rule 308. For the reasons set forth below, we answer each of the four certified questions in the negative.

¶ 18                                    II. ANALYSIS

¶ 19 The questions certified by the trial court are questions of law subject to *de novo* review. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 18. Resolution of the certified questions requires us to construe the Right of Conscience Act and the Religious Freedom Act. Statutory interpretation is likewise a question of law, subject to *de novo* review. *Id.*

¶ 20    Our primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 37 (2009). The plain and ordinary meaning of the language used in the statute is the most reliable indication of that intent. *Id.* at 37-38. "When the language used in a statute is plain and unambiguous, we may not depart from its terms by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent [citation], nor may we add provisions that are not found in a statute [citation]." *Id.* at 38. When the statute is unambiguous, we apply the statute without resort to other aids of statutory construction. *Palm v. Holocker*, 2018 IL 123152, ¶ 21. If the meaning of the statute is unclear, however, we may consider the underlying purpose of the law and the evils that the law was intended to remedy. *Id.* The statute must be read in its entirety and construed so as to give effect to every word, clause, and sentence. *Id.* Words and phrases are not construed in isolation and must be interpreted in light of the other relevant provisions of the statute. *Id.* We are obliged to construe statutes in a manner that avoids absurd, unreasonable, or unjust results that the legislature could not have intended. *Id.* With these principles in mind, we turn to the statutory language under review.

¶ 21                          A. Right of Conscience Act

¶ 22    On the same day the United States Supreme Court decided *Roe v. Wade*, 410 U.S. 113 (1973), recognizing that the fundamental right to privacy encompasses a woman's decision to have an abortion, the Court also decided *Doe v. Bolton*, 410 U.S. 179 (1973). In *Doe*, the Court struck down several provisions in the State of Georgia's abortion law, including a residency requirement as well as the requirements that abortions be conducted in licensed and accredited hospitals, that advance approval by a hospital abortion committee be obtained, and that two independent physicians confirm a performing physician's medical judgment that an abortion is justified for one of the reasons enumerated in the statute. *Id.* at 192-200. The remainder of the statute was left intact, including the provisions that a hospital "is free not to admit a patient for an abortion" and that "a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure." *Id.* at 197-98, 201 (citing Ga. Code Ann. § 26-1202(e) (1970)). The Court noted that these provisions "obviously are in the statute in order to afford appropriate protection to the individual and to the denominational hospital." *Id.* at 198.

¶ 23    In the wake of these decisions, a variety of legislation was enacted at the federal and state levels to address the moral dilemma in which health care providers might find themselves if called upon to provide services that are contrary to their consciences. See generally *City & County of San Francisco v. Azar*, 411 F. Supp. 3d 1001 (N.D. Cal. 2019) (reviewing history of federal conscience legislation). The Illinois legislature followed suit in 1977 with the enactment of the Right of Conscience Act. Section 5 of the statute at issue in this case provides:

> "It shall be unlawful for any person, public or private institution, or public official to discriminate against any person in any manner, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges, because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." 745 ILCS 70/5 (West 2014).

¶ 24    The Right of Conscience Act refines its reach in defining the terminology it sets forth, including its definition of "conscience" as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." *Id.* § 3(e).

¶ 25    Against this backdrop, we address the first three certified questions, which, at their core, concern how an employee proves a discrimination claim under the Right of Conscience Act and how an employer defends against the claim. Regarding the first and third certified questions, defendants argue that an employee must prove an adverse employment action, as traditionally required in Title VII jurisprudence, to establish a discrimination claim under the Right of Conscience Act and that a reasonable accommodation, as that term is used under Title VII, is a defense to a Right of Conscience Act claim.

¶ 26    Defendants contend that the Right of Conscience Act should be read *in pari materia* with Title VII, as Title VII is "the cornerstone of anti-discrimination law" and prohibits discrimination on various grounds, including discrimination based on religion. See 42 U.S.C. § 2000e-2 (2012). Defendants point out that the analytical framework for resolving Title VII employment-discrimination claims has been adopted by Illinois courts in resolving employment-discrimination claims under the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2018); see, *e.g.*, *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989)) and under municipal ordinances (see, *e.g.*, *Powell v. City of Chicago Human Rights Comm'n*, 389 Ill. App. 3d 45, 53 (2009)). Thus, they contend, the framework should be applied to analyze an employee's Right of Conscience Act claim. We disagree.

¶ 27    The doctrine of *in pari materia* allows "two statutes dealing with the same subject [to] be considered with reference to one another to give them harmonious effect." *People v. McCarty*, 223 Ill. 2d 109, 133 (2006). However, a court may resort to this interpretive principle only if the statute under review is ambiguous. *People v. 1946 Buick*, 127 Ill. 2d 374, 376 (1989); *5510 Sheridan Road Condominium Ass'n v. U.S. Bank*, 2017 IL App (1st) 160279, ¶ 28.

¶ 28    Defendants maintain that the term "discriminate" as set forth in section 5 of the Right of Conscience Act is ambiguous. But they never raised this argument in the trial court and instead simply called for the application of the framework for Title VII claims. They also failed to make the argument in their opening brief in this court, instead contending for the first time in their reply brief that "discriminate" is ambiguous. Accordingly, the argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief ***."); *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 85 (issues not raised in the trial court are forfeited and may not be raised on appeal).

¶ 29    Forfeiture aside, defendants' argument lacks merit. Defendants contend that the term "discriminate" is susceptible to varying interpretations. In support, they cite *CSX Transportation, Inc. v. Alabama Department of Revenue*, 562 U.S. 277 (2011), *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582 (1983), and *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). Defendants provide no analysis of these decisions beyond mere parenthetical descriptions. A close review of the cases demonstrates that they do not offer a persuasive basis for defendants' position.

¶ 30    In *Guardians Ass'n* and *Bakke*, the Court wrestled with the reach of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.* (1982)), which prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance. The lead opinions in those cases noted the ambiguity of the term "discrimination"

in the statute in the context of resolving, respectively, that Title VI proscribed disparate-impact discrimination in addition to intentional discrimination and that Title VI does not prohibit a recipient of federal aid from taking race into account in an affirmative action program designed to eradicate the effects of past discrimination. *Guardian Ass'n*, 463 U.S. at 592 (opinion of White, J.); *Bakke*, 438 U.S. at 284 (opinion of Powell, J.).

¶ 31    Subsequently, however, in *CSX Transportation*, 562 U.S. at 286, the Court relied upon the "ordinary meaning of the word [discriminates]" as set forth in its dictionary definition. The issue was whether the sales and use tax the State of Alabama imposed on railroads when they purchase or consume diesel fuel (but not imposed on their competition—interstate motor and water carriers) could be challenged as a discriminatory tax in violation of the Railroad Revitalization and Regulatory Reform Act of 1976 (49 U.S.C. § 11501(b)(4) (2006) (prohibiting a State from "[i]mpos[ing] another tax that discriminates against a rail carrier")). In holding that it could, the Court noted that the statute did not define "discriminates" and thus the Court turned to the "ordinary meaning of the word," relying on the dictionary definition: " 'Discrimination' is the 'failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.' " CSX Transportation, 562 U.S. at 286 (quoting Black's Law Dictionary 534 (9th ed. 2009)); see *id.* at 286-87 (stating " 'discriminates' means 'to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit' " (quoting Webster's Third New International Dictionary 648 (1976))). Accordingly, the Court concluded, to charge one group of taxpayers a lower rate than another group of taxpayers, if the groups are the same in all relevant respects, is to discriminate. *Id.* at 287.

¶ 32    Notwithstanding the foregoing, defendants cite *CSX Transportation* for the proposition that "[e]ven though 'discriminate' has a general legal meaning relating to differential treatment, its precise contours still depend on its context." This is a quote from the dissent, not the majority opinion. *CSX Transportation*, 562 U.S. at 298 (Thomas, J., dissenting, joined by Ginsburg, J.) (citing *Guardian Ass'n*, 463 U.S. at 592 (opinion of White, J.), and *Bakke*, 438 U.S. at 284 (opinion of Powell, J.)). Defendants simply present no persuasive legal basis upon which to hold that the term "discriminate" as set forth in section 5 of the Right of Conscience Act is ambiguous. To the contrary, the ordinary meaning of the word is set forth in its dictionary definition, as the Court in *CSX Transportation* reasoned. See *id.* at 286 (majority opinion).

¶ 33    The application of the doctrine of *in pari materia* is not appropriate here in any event. Statutes are *in pari materia* if "they have the same purpose or object or relate to the same person or thing." *Wells v. Great Atlantic & Pacific Tea Co.*, 171 Ill. App. 3d 1012, 1019 (1988). However, where statutes address different subjects and were enacted for different purposes, the *in pari materia* doctrine does not apply. *Miller v. American Infertility Group of Illinois, S.C.*, 386 Ill. App. 3d 141, 151 (2008).

¶ 34    Title VII and the Right of Conscience Act address different subjects and were enacted for different purposes. The goal of Title VII is to eliminate discrimination in the workplace. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 342 (2013) ("Title VII is central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces and in all sectors of economic endeavor."); *Equal Employment Opportunity Comm'n v. Shell Oil Co.*, 466 U.S. 54, 77 (1984) ("The dominant purpose of [Title VII], of course, is to root out discrimination in employment."). In contrast, the Right of Conscience Act (with its full title the "Health Care Right of Conscience Act") "deals specifically with the

issue of health care" (*Morr-Fitz, Inc. v. Quinn*, 2012 IL App (4th) 110398, ¶ 54) and is not confined to the employment context. Rather, the statute prohibits discrimination against "any person" because of "such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." 745 ILCS 70/5 (West 2014); see also *id.* § 12 ("Any person, association, corporation, entity or health care facility injured by any public or private person, association, agency, entity or corporation by reason of any action prohibited by this Act may commence a suit therefor ***."). Thus, in *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1096 (1995), the court held that a patient and her husband stated a claim against a hospital and a male nurse under the Right of Conscience Act based on their alleged failure to honor the plaintiffs' religious belief that prohibited being seen unclothed by a member of the opposite sex.

¶ 35    Accordingly, while the certified questions here are framed in terms of an "employee's" burden under the statute, the Right of Conscience Act is not so confined. As Title VII and the Right of Conscience Act set forth different terms and serve distinct purposes, application of the doctrine of *in pari materia* is not warranted.

¶ 36    Defendants nonetheless resort to the argument they raised in the trial court—simply that Title VII's analytical framework should be imposed on a Right of Conscience Act discrimination claim raised in the employment context, like plaintiff's claim here. Initially, as articulated in the first certified question, defendants contend that an employee should be required to prove an adverse employment action, as traditionally required in Title VII actions, to establish a Right of Conscience Act claim. Their argument finds its footing in the familiar burden-shifting method of proof for establishing intentional discrimination, first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

¶ 37    Under this framework, the plaintiff has the initial burden of setting forth a *prima facie* case of discrimination by establishing that he or she is a member of a protected class, that the plaintiff's job performance met the employer's legitimate expectations, that the plaintiff suffered an adverse employment action, and that similarly situated employees outside of the protected class received more favorable treatment. *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). If the plaintiff satisfies this burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* At that point, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. *Id.* The ultimate burden of persuasion, however, "remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

¶ 38    We note parenthetically that this framework has long been referred to as the "indirect" method of proving an intentional-discrimination claim, but the Seventh Circuit recently cautioned courts to consider the evidence as a whole and "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). We addressed the *Ortiz* decision in *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 41, pointing out that "the *McDonnell Douglas* burden-shifting approach is not a requirement in employment discrimination claims." Rather, the approach is " 'a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases'; it is 'not the only way to assess circumstantial evidence of

discrimination.' " *Id.* (quoting *David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)).

¶ 39    Regardless, without any discussion of context or content, defendants would have us pluck from this body of Title VII jurisprudence the concept of establishing an adverse employment action as part of a plaintiff's *prima facie* case of discrimination and drop it into the Right of Conscience Act. Principles of statutory construction prohibit this. See *Acme Markets*, 236 Ill. 2d at 38 (where the statutory language is plain and unambiguous, we may not add provisions that are not found in the statute).

¶ 40    Indeed, the adverse employment action requirement is a constricting concept, the purpose of which is " 'to provide a reasonable limiting principle for the type of conduct actionable under the statute.' " *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (quoting *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006)). Accordingly, an adverse employment action is defined as a " 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.' " *Id.* (quoting *Bell v. Environmental Protection Agency*, 232 F.3d 546, 555 (7th Cir. 2000)). The plain language of the Right of Conscience Act sets forth no qualification that its protection applies only when the plaintiff can establish the particularized adverse employment action cognizable under Title VII.

¶ 41    Defendants' discussion of an adverse employment action centers on the jurisprudential concept as set forth in the *McDonnell Douglas* burden-shifting approach. But the particular language of Title VII is instructive too. Title VII provides that

> "[i]t shall be an unlawful employment practice for an employer ***
>
>    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1) (2012).

The limitation of statutory protection to those who have suffered what is called an adverse employment action, like the protection set forth in Title VII and other federal statutes prohibiting discrimination in employment, is "judicial shorthand (the term does not appear in the statutes themselves) for the fact that these statutes require the plaintiff to prove that the employer's action of which he is complaining altered the terms or conditions of his employment." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Thus, in *Power*, the Seventh Circuit rejected the application of the adverse-employment-action requirement to a claim under 42 U.S.C. § 1983 for retaliation in violation of the first amendment to the United States Constitution (U.S. Const., amend. I), reasoning that there is no such limiting language in section 1983—a statute "not *** even limited to employment." *Power*, 226 F.3d at 820; *cf. Lavalais v. Village of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013) (holding that an adverse employment action is required to establish a section 1983 claim based on race discrimination in violation of the equal protection clause).

¶ 42    Likewise, the "terms-and-conditions-of-employment" language does not appear in the Right of Conscience Act—a statute particular to the health care setting and, as discussed, not confined to the employment context. We are not at liberty to ignore the plain language of the Right of Conscience Act and read into it the limitation of an adverse employment action requirement as fashioned in Title VII jurisprudence.

¶ 43    Defendants contend that a reasonable accommodation—as that term is used under Title VII—is a defense to a Right of Conscience Act claim, and that argument fares no better. In fact, Title VII expressly provides a reasonable-accommodation defense in the text of the statute: "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (2012). An "undue hardship" is one where an accommodation of an employee's religious beliefs would result in "more than a *de minimis* cost" to the employer in the form of higher wages or lost efficiency. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). Contrary to Title VII's explicit provision of a reasonable-accommodation defense, the Right of Conscience Act is devoid of the defense.

¶ 44    The Right of Conscience Act was enacted years after Title VII and has been amended since, yet the Illinois legislature never incorporated a Title VII analysis for claims under the Right of Conscience Act. Had the Illinois legislature intended to limit the scope of prohibited discrimination to that which is actionable under Title VII, it could have done so. The absence of any such limitation in the language of the Right of Conscience Act reflects the lack of any intent to import the adverse-employment-action and reasonable-accommodation concepts into the statute.

¶ 45    Tellingly, defendants cite no decision that has applied Title VII's framework to a claim under the Right of Conscience Act. To the contrary, while not squarely faced with the issues set forth in the certified questions, Illinois courts have analyzed Right of Conscience Act claims pursuant to the plain language of the statute, without any suggestion that Title VII's framework would apply to the claims.

¶ 46    In this regard, we turn to the litigation involving the Right of Conscience Act that ensued after Illinois issued an administrative rule in 2005 (followed by amended versions) forcing pharmacies to dispense Plan B emergency contraception. In *Morr-Fitz, Inc. v. Blagojevich*, 371 Ill. App. 3d 1175 (2007), pharmacists and pharmacies sought to invalidate the rule, raising, *inter alia*, Right of Conscience Act and Religious Freedom Act claims. The appellate court affirmed the dismissal of the plaintiffs' claims on ground that the claims were not ripe for review and declined to address the alternative argument that the plaintiffs had not exhausted their administrative remedies. *Id.* at 1184.

¶ 47    The supreme court reversed, holding that the claims were ripe for judicial review in light of the rule's stated effect on the plaintiffs' business operations and the alleged chilling effect the rule had on their free exercise of religion. *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 494-95 (2008). The court also held, *inter alia*, that the plaintiffs were not required to exhaust their administrative remedies before filing their claims in circuit court, as the governing statute set forth no such procedure to do so, and, in any event, seeking recourse before the administrative agency would be futile under the circumstances of the case. *Id.* at 496-501.

¶ 48    The case was remanded to the trial court where, following trial, the court found the administrative rule invalid under the Right of Conscience Act and the Religious Freedom Act and issued a permanent injunction against its enforcement. *Morr-Fitz, Inc.*, 2012 IL App (4th) 110398, ¶ 3. On appeal, although the appellate court found the injunction overly broad and modified its reach, it affirmed the trial court's findings that enforcing the rule against the plaintiffs on the issue of emergency contraceptives would violate the Right of Conscience Act. *Id.* Relying on the plain language set forth in the statute, including the definitions of "health

care" and "health care facility," the court held that the Right of Conscience Act applies to the practice of pharmacy and that the provision of emergency contraceptives is not "emergency medical care," the obligation for which a pharmacist is not relieved from providing under the Right of Conscience Act. *Id.* ¶¶ 61-62, 66-77.

¶ 49 Significantly, the court also rejected an argument set forth by the American Civil Liberties Union of Illinois in its *amicus curiae* brief, that the Right of Conscience Act should be interpreted and applied according to the framework set forth in the Religious Freedom Act. *Id.* ¶¶ 54-55 (citing 775 ILCS 35/15 (West 2010)). The court found the Religious Freedom Act inapplicable, reasoning, *inter alia*, that the Right of Conscience Act specifically addresses the issue of health care, while the Religious Freedom Act applies broadly to any governmental action that substantially burdens a person's exercise of religion. *Id.* Here, we likewise interpret the Right of Conscience Act according to its plain language. There is no basis to import the statutory scheme of Title VII into the Right of Conscience Act.

¶ 50 We are further persuaded by the federal district court's decision in *Vandersand v. Wal-Mart Stores, Inc.*, 525 F. Supp. 2d 1052 (C.D. Ill. 2007), which also involved a pharmacist who refused to dispense Plan B emergency contraception on the ground of a sincerely held moral conviction. His employer, Wal-Mart, placed him on an unpaid leave, and the pharmacist raised a claim under the Right of Conscience Act as well as a claim under Title VII for religious discrimination. *Id.* at 1055. In denying Wal-Mart's motion to dismiss, the district court analyzed the Right of Conscience Act and Title VII claims separately, addressing the adverse-employment-action requirement and the reasonable-accommodation defense only in the context of the Title VII claim. There was no suggestion that Title VII's framework applied to the Right of Conscience Act claim. *Id.* at 1055-56. To the contrary, the court held that a pharmacist is covered by the Right of Conscience Act simply because "[the plaintiff] alleges that he refused to provide medication because of his conscience; Wal-Mart knew that he refused to provide medication because of his conscience, and Wal-Mart placed him on unpaid leave because of his act of conscience. [The plaintiff] states a claim." *Id.* at 1057.

¶ 51 In sum, we may not depart from the plain language of the Right of Conscience Act by reading into it conditions that conflict with the express legislative intent or by adding provisions that are not found in the statute. See *Acme Markets*, 236 Ill. 2d at 37-38. Accordingly, we may not impose Title VII's analytical framework or its explicit statutory defense of a reasonable accommodation on an employee's Right of Conscience Act claim. We therefore answer the first and third certified questions in the negative.

¶ 52 That brings us to the second certified question, which asks: "If an employee contends that a job duty violates their [*sic*] right of conscience under the [Right of Conscience Act], does a transfer of that employee to a job which does not include the objected-to duty necessarily violate [section 5 of the Right of Conscience Act]?" Pursuant to well settled principles of statutory construction, we are compelled to hold that the answer is no.

¶ 53 We revisit the plain language of section 5, which provides that

"[i]t shall be unlawful for any person, public or private institution, or public official to discriminate against any person in any manner, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in

any particular form of health care services contrary to his or her conscience." 745 ILCS 70/5 (West 2014).

¶ 54    Under the plain language of the statute, it is unlawful to discriminate against any person in any manner because of the person's conscience-based objection to participation in a particular form of health care services. A "transfer," as set forth in the statute, is included in the enumerated list of prohibited manners of discrimination. *Id.* But so is "licensing, hiring, promotion *** or any other privileges." *Id.* If transferring an employee who invokes a conscience-based objection to participation in a particular form of health care services were *ipso facto* a violation of the statute, then so too would licensing, hiring, or promoting the employee. We are obliged to presume that the legislature did not intend such consequences. See *Penkava v. Kasbohm*, 117 Ill. 2d 149, 154 (1987) (" '[W]here a literal enforcement of a statute would result in great injustice or absurd consequences, courts are bound to presume that such consequences were not intended and to adopt a construction which, it is reasonable to assume, was contemplated by the legislature.' " (quoting *People ex rel. Community High School District No. 231 v. Hupe*, 2 Ill. 2d 434, 448 (1954))). The statutory scheme makes clear that acts of discrimination with respect to these privileges is prohibited, not that the enumerated action in and of itself is prohibited.

¶ 55    Indeed, the Illinois legislature made its findings and policy underlying the Right of Conscience Act explicit in the statute:

> "The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of *discrimination*, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care." (Emphasis added.) 745 ILCS 70/2 (West 2014).[1]

¶ 56    Thus, by prohibiting discrimination against one who exercises the right of personal conscience, the statute reflects an intent to protect that right in the provision of health care services. Robotically proscribing an employer from transferring an employee to a job that does not include a duty to which the employee has invoked a conscience-based objection would be inconsistent with the statute's clear purpose.

¶ 57    Moreover, inherent in the statute is the recognition that health care facilities are in the business of providing health care services that might include those that are contrary to an employee's conscience. See *id.* § 3(a), (d) (defining, respectively, "health care" and "health care facility"). If plaintiffs' position that a transfer necessarily violates the statute were adopted, health care facilities would be required to allow an employee who invokes a

---

[1]We note that the Right of Conscience Act was amended to, *inter alia*, incorporate a requirement that health care facilities adopt protocols regarding access to care and information (see Pub. Act 99-690, § 5 (eff. Jan. 1, 2017)). During oral argument, counsel advised that litigation challenging the amendments is ongoing at the trial court level.

- 13 -

conscience-based objection to particular job duties to remain in the employee's position and not perform those duties. But the objectionable job duties might constitute a major portion or all of the employee's work. The legislature could not have intended to require the employer to pay an employee for performing no duties at the workplace. And there might be an instance where the objecting employee is the only employee who performs the particular duties. The legislature could not have intended that the employer effectively cease its operations, leaving no one employed at the business. We are obliged to construe the statute in a manner that avoids such absurd, unreasonable, or unjust results. See *Palm*, 2018 IL 123152, ¶ 21.

¶ 58 Plaintiff's response is that transferring an employee to a different job that does not include objected-to duties necessarily violates the Right of Conscience Act *if* the transfer is because the employee exercised his or her right of conscience. This amounts to a tautological argument; the qualification that the transfer was because of the asserted right is inherent in the certified question. Plaintiff provides no persuasive legal basis to support her construction of the Right of Conscience Act. Principles of statutory construction compel us to answer the second certified question in the negative.

¶ 59 We reiterate in conclusion that the trial court held that there were genuine issues of material fact as to whether plaintiff was transferred. We express no opinion on this ruling. See *Miller*, 386 Ill. App. 3d at 144 ("When reviewing certified questions under Rule 308, we only answer the certified questions posed. We do not render an opinion or rule on the propriety of any underlying order of the trial court.").

¶ 60                                B. The Religious Freedom Act

¶ 61 In resolving whether a challenged governmental action violated the free exercise clause of the first amendment to the United States Constitution (U.S. Const., amend. I), courts had historically applied a balancing test that considered whether the challenged action imposed a substantial burden on the practice of religion and, if so, whether it was necessary to serve a compelling governmental interest. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693-94 (2014) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 210-11, 234-36 (1972)); *Sherbert v. Verner*, 374 U.S. 398, 408-09 (1963). However, this method of analyzing free-exercise claims was rejected by the United States Supreme Court in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990). *Burwell*, 573 U.S. at 694 (citing *Smith*, 494 U.S. at 883, 888). In *Smith*, 494 U.S. at 874, the plaintiffs were terminated from their jobs at a drug rehabilitation organization for violating a state law (which proscribed knowing or intentional possession of a controlled substance) by "ingest[ing] peyote for sacramental purposes at a ceremony of the Native American Church, of which both are members." The state denied their claims for unemployment benefits on the ground that they were ineligible because they had been discharged for work-related misconduct. *Id.* The Court rejected their free-exercise claims, ruling: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)).

¶ 62 Congress responded in 1993 with the enactment of the Religious Freedom Restoration Act of 1993 (Religious Freedom Restoration Act) (42 U.S.C. § 2000bb(b) (1994)) "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963)[,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)[,] *** to guarantee its application in all cases where free exercise

of religion is substantially burdened," and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." However, in *City of Boerne v. Flores*, 521 U.S. 507, 532-34 (1997), the Court limited the applicability of the Religious Freedom Restoration Act to the federal government, concluding that the statute exceeded the scope of Congress's enforcement power under section 5 of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV, § 5) by applying the law to the states.

¶ 63    The Illinois legislature, in turn, responded in 1998 with its enactment of the Religious Freedom Act:

> "(1) To restore the compelling interest test as set forth in Wisconsin v. Yoder, 406 U.S. 205 (1972), and Sherbert v. Verner, 374 U.S. 398 (1963), and to guarantee that a test of compelling governmental interest will be imposed on all State and local (including home rule unit) laws, ordinances, policies, procedures, practices, and governmental actions in all cases in which the free exercise of religion is substantially burdened [as well as]
>
> (2) [t]o provide a claim or defense to persons whose exercise of religion is substantially burdened by government." 775 ILCS 35/10(b) (West 2014).

Accordingly, the Religious Freedom Act provides:

> "Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 15.

¶ 64    The fourth certified question asks whether a reasonable accommodation, again as that term is used in Title VII jurisprudence, is a defense to a Religious Freedom Act claim. In accordance with the plain language of the Religious Freedom Act, explicit in the purpose for which it was enacted, we answer this question in the negative.

¶ 65    Defendants concede, as they must, that the Religious Freedom Act does not explicitly provide for a defense based upon reasonable accommodation. They nevertheless call for the application of a particularized framework to govern a Religious Freedom Act claim in the government employment context. They point out that the "hallmark of a substantial burden *** is the presentation of a coercive choice of either abandoning one's religious convictions or complying with the governmental regulation." *Diggs v. Snyder*, 333 Ill. App. 3d 189, 195 (2002). Accordingly, defendants contend, "where a defendant can show, in a government-employment setting, that it reasonably accommodated an employee's religious objections to some aspect of her job duties, by eliminating the conflict between employment requirements and religious beliefs, then it has rebutted any claim that it prevented her from engaging in conduct or having a religious experience that her faith mandates." There is no basis in the plain language of the Religious Freedom Act to support our imposition of this framework. Indeed, the Illinois legislature could not have been more clear in setting forth the statute's purpose to "restore the compelling interest test" as set forth in *Yoder* and *Sherbert*. 775 ILCS 35/10(b) (West 2014). The statute, in turn, explicitly sets forth the compelling-interest test. *Id.* § 15. There is no mention of a reasonable-accommodation defense in this test.

¶ 66    Defendants maintain that they "take no issue" with the compelling-interest test and "do not argue that reasonable accommodation should replace that aspect." Rather, their position is that,

"in an employment context, the question of reasonable accommodation should precede any analysis of compelling governmental interests because it would negate a plaintiff's showing of a substantial burden." Essentially, defendants would have us carve out those free-exercise claims that arise in the employment context and impose exclusively thereon a Title VII-like framework. We are the judiciary, not the legislature. We may not read into a statute provisions that are not there. See *Acme Markets*, 236 Ill. 2d at 37.

¶ 67 As a final matter, defendants reiterate their challenge to the applicability of the Religious Freedom Act in the government employment context. The trial court rejected this argument, criticizing defendants for what effectively amounted to an argument to "rewrite" the Religious Freedom Act to make it inapplicable to public employees. Defendants concede that this argument is beyond the scope of the certified question. We therefore have no jurisdiction to address it. See *Sassali v. DeFauw*, 297 Ill. App. 3d 50, 51 (1998) ("Our jurisdiction under Rule 308 is limited to considering the certified question and we cannot address issues outside that area."). The certified question asks whether a reasonable accommodation, as that term is used in Title VII jurisprudence, is a defense to a Religious Freedom Act claim. In accordance with the plain language of the Religious Freedom Act, we answer this question in the negative.

¶ 68 III. CONCLUSION

¶ 69 For the foregoing reasons, we answer each of the certified questions in the negative.

¶ 70 Certified questions answered; cause remanded.