2022 IL App (4th) 220270
NOS. 4-22-0270, 4-22-0271, 4-22-0272, cons.

FILED
April 13, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| JOSHUA GRAHAM and ANDREW VICE,<br>　　　　　Plaintiff-Appellants,<br>　　　　　v.<br>PEKIN FIRE DEPARTMENT, CITY OF PEKIN,<br>ILLINOIS DEPARTMENT OF PUBLIC HEALTH,<br>and JAY R. PRITZKER, in His Official Capacity as<br>Governor of the State of Illinois,<br>　　　　　Defendant-Appellees.<br>_____ | ) Appeal from the<br>) Circuit Court of<br>) Sangamon County<br>) Nos. 21CH500014,<br>) 21CH500013, 21CH500008<br>)<br>) No. 4-22-0270<br>)<br>)<br>)<br>)<br>) |
| JANELLE HERMANN, Individually, as Well as on<br>Behalf of All Other Persons Similarly Situated,<br>　　　　　Plaintiff-Appellant,<br>　　　　　v.<br>DELAND-WELDON CUSD #57, a Body Politic and<br>Corporate, AMANDA GEARY, as Superintendent<br>Deland-Weldon CUSD #57, ILLINOIS DEPARMENT<br>OF PUBLIC HEALTH, ILLINOIS STATE BOARD<br>OF EDUCATION, and JAY R. PRITZKER, in His<br>Official Capacity as Governor of the State of Illinois,<br>　　　　　Defendants-Appellees.<br>_____ | )<br>)<br>)<br>)<br>)<br>) No. 4-22-0271<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| JEAN R. GLASS, JESSE J. FOWLER, TRINA<br>TANGEROSE, VALERIE L. GREGORY, MIKE<br>WINTERS, KIMBERLY K. WATSON, RICHARD<br>W. LOGAN, and GREGORY L. GURSKI,<br>Individually, as Well as on Behalf of All Other Persons<br>Similarly Situated,<br>　　　　　Plaintiffs-Appellants,<br>　　　　　v. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 4-22-0272 |

ILLINOIS DEPARTMENT OF CORRECTIONS;       )
ILLINOIS DEPARTMENT OF HUMAN SERVICES;    )
ILLINOIS DEPARTMENT OF VETERAN AFFAIRS;   )
ILLINOIS DEPARTMENT OF JUVENILE JUSTICE;  )
ILLINOIS DEPARTMENT CENTRAL               )
MANAGEMENT SERVICES; ILLINOIS             )
DEPARTMENT OF PUBLIC HEALTH; THE          )
ILLINOIS NURSES ASSOCIATION; THE          )
AMERICAN FEDERATION OF STATE, COUNTY      )
AND MUNICIPAL EMPLOYEES, COUNCIL 31;      )
ILLINOIS STATE EMPLOYEES ASSOCIATION,     )
LOCAL 2002; WEXFORD HELATH SERVICES,      )
INC., and JAY R. PRITZKER, in His Official Capacity ) Honorable
as Governor of the State of Illinois,     ) Jennifer M. Ascher,
      Defendants-Appellants.   ) Judge Presiding.

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Knecht concurred in the judgment.
Justice Steigmann dissented.

**OPINION**

¶ 1      According to the complaints in these three appeals, the plaintiffs work for or used to work for public employers in Illinois, either on the local level or the state level. We will refer to the plaintiffs, collectively, as "the employees." In the circuit court of Sangamon County, the employees petitioned for the issuance of temporary restraining orders that would bar the public employers and Governor Pritzker from enforcing a workplace policy requiring all employees either to be vaccinated against COVID-19 or, alternatively, to undergo regular testing for COVID-19. The court denied the petitions for temporary restraining orders. The employees appeal. We find no abuse of discretion in that ruling. Therefore, we affirm the judgments in these three cases.

¶ 2      I. BACKGROUND

¶ 3      The employees allege that the public employers gave them a choice: either become fully vaccinated against COVID-19 or, alternatively, if vaccination is unacceptable for

moral or medical reasons, undergo regular testing for the virus. Both of those options, the employees plead, are offensive to their conscience. Now they face, or already have incurred, unpaid suspension or discharge for noncompliance with this new COVID-19 policy—a policy that, the employees allegedly learned from their employers, had been handed down from the Governor.

¶ 4        The employees sought declaratory and injunctive relief against the public employers, the Governor, and the Illinois Department of Public Health (Health Department), among other defendants. According to the employees, the vaccination or testing policy was unauthorized by law. They maintained that only the Health Department had statutory authority to quarantine people and to require them to be vaccinated against, or to be tested for, contagious diseases. The employees further claimed that imposing the vaccination or testing policy upon them was an act of discrimination prohibited by section 5 of the Right of Conscience Act (Conscience Act) (745 ILCS 70/5 (West 2020)).

¶ 5        Concluding that the pleadings failed to establish any claim that was likely to succeed on its merits, the circuit court denied the employees' petitions for temporary restraining orders.

¶ 6        The employees appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017).

¶ 7                                II. ANALYSIS

¶ 8        A. The Showing Required For the Issuance of a Temporary Restraining Order

¶ 9        A party who petitions a circuit court to issue a temporary restraining order "must establish" for the court that the following four propositions hold true: (1) the party has a "protectible right," (2) the party will "suffer irreparable harm" if the petition is denied, (3) the "remedy at law is inadequate," and (4) "there is a likelihood of success on the merits." *Jacob v.*

*C & M Video, Inc.*, 248 Ill. App. 3d 654, 664 (1993). The appellate court in *Jacob* uses the phrase "must establish" but in the next sentence clarifies, "The party seeking relief is not required to make out a case which would entitle him to relief on the merits; rather, he need only show that he raises a fair question about the existence of his right and that the court should preserve the status quo until the case can be decided on the merits." (Internal quotation marks omitted.) *Id.*

¶ 10    It is for the circuit court, not for us, to decide whether the party has raised a fair question about the existence of the claimed right and the need to preserve the status quo. The question for us is whether, by granting or denying a temporary restraining order (as the case may be), the circuit court abused its discretion. See *id.*; *C.D. Peters Construction Co. v. Tri-City Regional Port District*, 281 Ill. App. 3d 41, 47 (1996). Posing the question "Did the circuit court abuse its discretion?" means applying "the most deferential standard of review" recognized by the law—"next to no review at all." *In re D.T.*, 212 Ill. 2d 347, 356 (2004). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 11    The employees claim that the circuit court abused its discretion by denying their petitions for temporary restraining orders. The employees maintain that the court should have granted their petitions because, under section 5 of the Conscience Act (745 ILCS 70/5 (West 2020)) and section 2305 of the Department of Public Health Act (Health Act) (20 ILCS 2305/2 (West 2020)) as the employees interpret those statutes, they have the right not to be subjected to an employment requirement of being vaccinated or tested for COVID-19.

¶ 12    Let us examine those two statutes one at a time.

¶ 13                    B. The Conscience Act

¶ 14    The employees claim that by conditioning their continued employment on their being either vaccinated or tested for COVID-19, the employers do that which is "unlawful": the employers "discriminate against" the employees "because of [their] conscientious refusal to receive" or "participate in" a "form of health care services." 745 ILCS 70/5 (West 2020). Section 5 of the Conscience Act provides as follows:

> "It shall be unlawful for any person, public or private institution, or public official to discriminate against any person in any manner, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges, because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." *Id.*

¶ 15    One of the reasons why the circuit court denied the employees' petitions for temporary restraining orders was that recently the General Assembly passed an amendment making clear that it was not a violation of the Conscience Act for any employer to take measures calculated to prevent the spread of COVID-19. The amendment, which will go into effect on June 1, 2022, reads as follows:

> "It is not a violation of this Act for any person or public official, or for any public or private association, agency, corporation, entity, institution, or employer, to take any measures or impose any requirements, including, but not limited to, any measures or requirements that involve provision of services by a physician or health care personnel, intended to prevent contraction or transmission of COVID-19 or any pathogens that result in COVID-19 or any of its subsequent iterations. It is not

a violation of this Act to enforce such measures or requirements. This Section is a declaration of existing law and shall not be construed as a new enactment. Accordingly, this Section shall apply to all actions commenced or pending on or after the effective date of this amendatory Act of the 102nd General Assembly. Nothing in this Section is intended to affect any right or remedy under federal law." Public Act 102-667, § 5 (eff. June 1, 2022).

¶ 16 The employees make essentially two arguments against the circuit court's reliance on this statutory amendment. First, the employees argue that because the amendment does not go into effect until June 1, 2022, it is inapplicable to their cases. Second, the employees argue that, even though the amendment purports to be "a declaration of existing law" (*id.*), the legislature cannot retroactively change the meaning of an unambiguous statute. The employees quote the supreme court: "An amendment of an ambiguous statute indicates a purpose to change the law, while no such purpose is indicated by the mere fact of an amendment of an unambiguous provision." *O'Connor v. A & P Enterprises*, 81 Ill. 2d 260, (1980). Also, the supreme court has held, "[T]he legislative intent that controls the construction of a public act is the intent of the legislature that passed that act, not the intent of the legislature that amends the act many years later." *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund of Chicago*, 2018 IL 122793, ¶ 50.

¶ 17 On this question of subsequent legislative history, Sutherland on Statutory Construction provides the following summary of case law:

"More broadly, a subsequent legislature may change an act to achieve whatever prospective meaning or effect it desires, but courts generally give little or no weight to the views of members of subsequent legislatures about the meaning of acts

- 6 -

passed by previous legislatures. However, while the views of a subsequent legislature cannot override the unmistakable intent of the enacting one, such views may be entitled to significant weight, particularly when the precise intent of the enacting legislature is obscure." 2A Norman J. Singer, Sutherland Statutory Construction § 48:20 (7th ed. 2021).

The interpretive relevance of Public Act 102-667, § 5 (eff. June 1, 2022), therefore, depends on whether, prior to the public act, section 5 of the Act was "obscure," or ambiguous. 2A Singer, *supra*, § 48:20.

¶ 18 In *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 32, the appellate court rejected an argument that the term "discriminate," in section 5 of the Conscience Act, was ambiguous. "To the contrary," the appellate court observed, "the ordinary meaning of the word is set forth in its dictionary definition, as the [Supreme] Court *** reasoned" in *CSX Transportation, Inc. v. Alabama Department of Revenue*, 562 U.S. 277 (2011). In *CSX Transportation*, because the federal statute in question did not specially define "discriminate," the Supreme Court gave the word its ordinary meaning, which the Supreme Court obtained from dictionaries. *Rojas*, 2020 IL App (2d) 190215, ¶ 31. One dictionary defined "[d]iscrimination" as "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." (Internal quotation marks omitted.) *Rojas*, 2020 IL App (2d) 190215, ¶ 31. Another dictionary defined "discriminates" as "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." (Internal quotation marks omitted.) *Id.* "Accordingly, the [Supreme] Court concluded [in *CSX Transportation*], to charge one group of taxpayers a lower rate than another group of taxpayers, if the groups are the same in all relevant respects, is to discriminate." *Id.* The *Rojas* court reasoned:

"[The] [d]efendants simply present no persuasive legal basis upon which to hold that the term 'discriminate' as set forth in section 5 of the *** Conscience Act is ambiguous. To the contrary, the ordinary meaning of the word is set forth in its dictionary definition, as the Court in *CSX Transportation* reasoned." *Id.* ¶ 32.

By that logic, however, a term in a statute would be ambiguous only if the term were a non-word. If the legislature's use of a word in a statute could be exonerated of ambiguity merely by pointing out that the definition of the word can be found in a dictionary, no statute would be ambiguous. Ambiguity, however, is a wider concept than the use of a non-word. Words, though individually intelligible, can be confusing in combination. A sentence, paragraph, or article of a statute written in standard English might be understood by reasonable readers in different ways. See *Land v. Board of Education of City of Chicago*, 202 Ill. 2d 414, 426 (2002) (explaining that "[a] statute is ambiguous if it is susceptible to two equally reasonable and conflicting interpretations").

¶ 19        Take the word "discriminate," for example, as it is used in the Conscience Act. If the word is considered in isolation, its meaning is clear enough. To "discriminate" means to "fail[] to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." (Internal quotation marks omitted.) *Rojas*, 2020 IL App (2d) 190215, ¶ 31. Or, to use a comparable definition, "discriminate[]" means "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." (Internal quotation marks omitted.) *Id.*

¶ 20        A complication arises, however, when we apply those dictionary definitions to a universally applicable workplace safety policy, such as the vaccination or testing policy. The employers believe that getting vaccinated or being tested for COVID-19 is a matter of individual

merit because a vaccinated or tested employee, in the employers' view, is *less likely* spread COVID-19 and, therefore, less likely to impair the efficiency of the employers' operations or to mar the employers' services to the public. So, the employers impose upon all employees, across the board, what the employers regards as a merit-based policy of vaccination or testing. It seems implausible that by the enactment of section 5 of the Conscience Act, the legislature intended to transform circuit courts into super personnel offices evaluating the wisdom or advisability of such a policy. Surely, employers are better fitted than the courts to determine what policies are most conducive to the efficiency of the employers' operations. If the employer honestly regards the policy as relevant to job-related merit and if the employer applies the policy to all employees without distinction, the employer has "treat[ed] all persons equally" and has "discriminated" against no one in the dictionary sense of the word. (Internal quotation marks omitted.) *Id.*

¶ 21    The trouble is, giving the word "discriminate" this ordinary, commonly accepted meaning of treating all persons equally would seem to conflict with the legislative intent expressed in section 2 of the Conscience Act (745 ILCS 70/2 (West 2020)). That section provides in part as follows:

> "It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or

arrange for the payment of health care services and medical care." 745 ILCS 70/2 (West 2020).

Let us assume, for the sake of argument that vaccination and testing for COVID-19 *both* meet the description of a "health care service[]." *Id.* On that assumption, section 5 would prohibit an employer from "discriminat[ing] against" employees whose conscience forbade them to agree to vaccination or testing. *Id.* § 5. Under the dictionary definition of "discriminate," the employer could fire such employees without falling afoul of section 5 provided that the employer also fired employees who, for reasons other than reasons of conscience, refused to be vaccinated or tested. In other words, the dictionary definition of "discriminate" would not hold true if the employer had a blanket policy of no vaccination or testing, no job. In fact, if the employee chose to retain the employees whose refusal was motivated by conscience and to fire the employees whose refusal was motivated by other considerations, the employer would discriminate in favor of the employees motivated by conscience and against the other employees. But if the employer had a policy of firing all noncompliant employees, without distinction, the employer could not be said to have discriminated against anyone in the ordinary meaning of "discriminate."

¶ 22        Here is the problem, however. If we give "discrimination" this ordinary meaning, we defeat the express legislative purpose of "respect[ing] and protect[ing] the right of conscience of all persons who refuse to obtain, receive[,] or accept *** health care services" and "prohibit[ing] all forms of *** disqualification" and "coercion *** upon such persons *** by reason of their refusing to act contrary to their conscience or conscientious convictions in *** refusing to obtain, receive, [or] accept *** health care services." *Id.* § 2. An employee who refused on the grounds of conscience would incur a penalty for his or her exercise of conscience. A reasonable reader, therefore, could get the impression that in sections 2 and 5 of the Conscience Act, the legislature

- 10 -

intended to use the word "discriminate" in an unconventional sense, as meaning taking an unfavorable action against someone who, for reasons of conscience, refuse to submit to or participate in any form of health care. The possibility that the legislature meant to use the word "discriminate" in an unconventional sense, in a sense contrary to its dictionary meaning, creates an ambiguity in the statute.

¶ 23    In the face of that ambiguity, we hold that the circuit court's resort to Public Act 102-667, § 5 (eff. June 1, 2022) as an interpretive aid is defensible. To quote from Sutherland again, "while the views of a subsequent legislature cannot override the unmistakable intent of the enacting one, such views may be entitled to significant weight, particularly when the precise intent of the enacting legislature is obscure." 2A Singer, *supra*, § 48:20. An ambiguity in sections 2 and 5 of the Conscience Act, particularly in the use of the word "discriminate," justifies a resort to Public Act 102-667, § 5 (eff. June 1, 2022) as an extrinsic aid of construction.

¶ 24                        B. The Health Act

¶ 25    The employees assert that their employers' vaccination or testing requirement violates section 2 of the Health Act (20 ILCS 2305/2 (West 2020)). The employees do not offer much of an explanation, though, of how that requirement violates the statute.

¶ 26    Section 2(a) of the Health Act provides that the Health Department "has supreme authority in matters of quarantine and isolation." *Id.* § 2(a). The employers, however, have not quarantined or isolated any employees, nor have the employers threatened to do so. Because the term "quarantine" is undefined by the Health Act, we give the term its dictionary meaning. See *People v. Chapman*, 2012 IL 111896, ¶ 24. A "quarantine" is "a state, period, or place of isolation in which people or animals that have arrived from elsewhere or been exposed to infectious or contagious disease are placed." New Oxford American Dictionary 1393 (2001). To "quarantine"

someone means to keep that person isolated from other members of society. *Cassell v. Snyders*, 458 F. Supp. 3d 981, 1002 (N.D. Ill. 2020). The threatened penalty for noncompliance with the vaccination or testing requirement is merely the loss of employment, not quarantine or isolation. To be fired is not to be quarantined or isolated from the community at large.

¶ 27 Section 2(d) of the Health Act provides that "[t]he [Health] Department may order physical examinations and tests and collect laboratory specimens as necessary for the diagnosis and treatment of individuals in order to prevent the probable spread of a dangerously contagious or infectious disease." 20 ILCS 2305/2(d) (West 2020). Section 2(d) further provides that if the individual refuses to consent to such testing and if "that refusal results in uncertainty regarding whether he or she has been exposed to or is infected with a dangerously contagious or infectious disease or otherwise poses a danger to the public's health, the individual may be subject to isolation or quarantine." *Id.* Similarly, section 2(e) (*id.* § 2(e)) provides that "[t]he [Health] Department may order the administration of vaccines *** to persons as necessary in order to prevent the probable spread of dangerously contagious or infectious disease" and that "the [Health] Department may, pursuant to the procedures in [section 2(c) [(*id.* § 2(c))], isolate or quarantine persons who are unable or unwilling to receive the vaccines."

¶ 28 Just because section 2 of the Health Act confers upon the Health Department such authority, it does not logically follow that the employers lack authority over workplace safety, such as the authority to require employees, on pain of loss of employment, to undergo vaccination or testing for infectious diseases such as COVID-19. "Administrative agencies have, in addition to the powers conferred upon them by explicit statutory language, the power to do all which is reasonably necessary to effectuate the powers and authorities explicitly granted to them." *Taylor v. State Universities Retirement System*, 203 Ill. App. 3d 513, 522 (1990). "An express grant of

- 12 -

power or duty to do a particular thing includes the express grant of power to do all that is reasonably necessary to execute the power or duty." *Owens v. Green*, 400 Ill. 380, 400 (1948). The employers surely have the power to lay down workplace safety rules, of which the vaccination or testing requirement is an example—because such power is reasonably necessary to effectuate the powers that the legislature explicitly granted to them.

¶ 29 Citing *Austin v. Board of Education of Community Unit School District 300*, 2022 IL App (4th) 220090-U, ¶ 15, the employees argue that the Governor lacks authority to "make final decisions on public health." The vaccination or testing requirement that the employees challenge, however, is not a decision on public health. "Public health" is "[t]he health of the community at large" or "[t]he healthful or sanitary condition of the general body of people or the community en masse; esp[ecially] the methods of maintaining the health of the community, as by preventive medicine and organized care for the sick." Black's Law Dictionary (11th ed. 2019) (sub-definition of "public health" in the definition of "health"). The vaccination or testing requirement is not calculated to maintain "the health of the community at large." *Id.* Nothing in the employers' policy prevents an employee, upon testing positive for COVID-19, from circulating in "the general body of people" outside the workplace and thereby spreading the infection. *Id.* The vaccination or testing requirement is, instead, a workplace safety rule and a workplace rule of considerate conduct toward the public that the agencies serve.

¶ 30 III. CONCLUSION

¶ 31 For the reasons we have explained, we find no abuse of discretion in the circuit court's decision that the employees have failed to establish a likelihood of success on the merits on their claims under the Conscience Act and the Health Act. Therefore, we affirm the circuit court's judgments in these three cases.

¶ 32 Affirmed.

¶ 33 JUSTICE STEIGMANN, dissenting:

¶ 34 Because I disagree with the analysis of my distinguished colleagues in the majority regarding the Conscience Act, I respectfully dissent.

¶ 35 Specifically, I disagree with the majority's view that the word "discriminate" as used in section 5 of the Act is somehow confusing or uncertain. I also disagree that Public Act 102-667, § 5 (eff. June 1, 2022) (adding 745 ILCS 70/13.5) may be used as an interpretive aid when construing section 5 of the Conscience Act.

¶ 36 I. "DISCRIMINATE" AS USED IN SECTION 5 OF THE CONSCIENCE ACT

IS NOT AMBIGUOUS OR UNCERTAIN

¶ 37 The majority writes at length about how the use of "discriminate" in section 5 of the Conscience Act is ambiguous, but the majority's analysis overlooks the majority of the language in that section that appears after the word "discriminate." In my opinion, that later language clearly establishes that the legislature intended the word "discriminate" to be read *as broadly as possible*.

¶ 38 Section 5 begins as follows: "It shall be unlawful for any person, public or private institution, or public official to discriminate against any person *in any manner* ***." (Emphasis added.) 745 ILCS 70/ (West 2020). The phrase "in any manner" is a strong indication—by itself— of just how broadly the legislature intended this prohibition against discrimination to apply. By using the phrase "in any manner," the legislature made clear a court evaluating claims of discrimination should not be concerned with identifying precisely how that discrimination occurred. Instead, that court is called upon to determine whether discrimination occurred "in any manner."

¶ 39 But just in case the legislature's intent in this regard was not clear enough, the legislature also included an astonishing number of examples of activities for which discriminatoion is prohibited. The legislature added,

> "including by not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges, because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience." *Id.*

¶ 40 I do not recall any other statute that contains such a detailed description of circumstances in which the statute is to apply. However, despite this extensive listing, the phrase "including but not limited to" essentially means that the legislature is saying to the courts, "Just in case we missed something that should also be included in this statutory prohibition against discrimination, please apply it."

¶ 41 The majority analysis also overlooks section 2 of the Conscience Act, which sets forth the purpose and policy of the Act. 745 ILCS 70/2 (West 2020). Section 2 reads as follows:

> "It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept *** medical care; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care." *Id.*

¶ 42    This is another exhaustive list of protections afforded to the citizens of this State by the Conscience Act and further demonstrates the legislature's intent that the protections of the Act be read as broadly as possible. The majority's parsing of a single word in the statute is simply insufficient, particularly given the importance of the civil rights at issue in this case.

¶ 43    II. PUBLIC ACT 102-667 MAY NOT BE USED AS AN INTERPRETIVE AID IN THIS CASE

¶ 44    I disagree with both the trial court and the majority that Public Act 102-667, § 5 (eff. June 1, 2022), may be used as an interpretive aid regarding the meaning of section 5 of the Conscience Act. The majority quotes the decision of the Illinois Supreme Court in *Carmichael* that makes clear it is the intent of the legislature that passed the Act, and not the intent of the legislature that amends the Act many years later, that counts for purposes of construing what the legislative intent of the earlier Act was. *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund of Chicago*, 2018 IL 122793, ¶ 50. Yet, the majority then cites a legal treatise on statutory construction as a basis for somehow disregarding this clear statement from the Illinois Supreme Court rendered just four years ago. The majority similarly disregards the decision of the Second District in *Rojas* that rejected an argument that the term "discriminate" in section 5 of the Conscience Act is ambiguous. *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 32. In my opinion, *Rojas* was decided correctly, and the majority should follow the Supreme Court of Illinois, not legal treatises.

¶ 45    The majority is correct that the standard of review for this court when considering a trial court's ruling granting or denying a temporary restraining order is whether the trial court abused its discretion. However, when the trial court's exercise of its discretion is based upon an incorrect legal analysis, this court's review is no longer deferential. *Fox Fire Tavern, LLC v.*

*Pritzker*, 2020 IL App (2d) 200623, ¶ 11, 161 N.E.3d 1190 (citing *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 63, 866 N.E.2d 85, 91 (2006)). That is the situation in the present case.

¶ 46        The majority notes that the trial court denied the petitions for temporary restraining orders, in part, because of Public Act 102-667, § 5 (eff. June 1, 2022). See *supra* ¶ 15. The trial court, like the majority, deemed section 5 of the Conscience Act ambiguous and, as the majority explains, resorted to "Public Act 102-667, § 5 (eff. June 1, 2022), as an interpretive aid." See *supra* ¶ 23. Because, as I have explained, section 5 of the Conscience Act is not ambiguous, the trial court erred—as does the majority—in using it as "an interpretive aid." Accordingly, the deference normally due to a trial court's decision denying the temporary restraining orders is not appropriate in this case due to the trial court's mistake of law.

¶ 47        Assuming that the passage of Public Act 102-667 will render moot the claims brought by the employees in these cases, those claims are not moot yet. Because Public Act 102-667 is not effective until June 1, 2022, the employees are still entitled to whatever protection section 5 of the Conscience Act provides them. And given the rapidity with which expert opinions regarding COVID-19 seem to be changing, the protection the employees now seek is hardly illusory. No one can say with certainty what the circumstances will be regarding what experts will advise concerning COVID-19 45 days hence.

¶ 48        III. THE DIFFICULTIES OF APPELLATE REVIEW OF TEMPORARY
RESTRAINING ORDERS

¶ 49        One of the difficulties of serving on an appellate court reviewing the issuance or denial of a temporary restraining order is the time constraints this court faces. For instance, Illinois Supreme Court Rule 307(d)(4) (eff. Nov. 1, 2017) directs this court to decide the appeal—in this

case, three consolidated appeals raising generally the same issues—"within five business days." Rule 307(d)(4) also provides that this court may not conduct oral arguments on these appeals.

¶ 50    I am fully aware that resolution of appeals concerning the denial or granting of temporary restraining orders must be done expeditiously, but the above constraints make difficult the careful deliberation such appeals not only deserve but often require.

¶ 51    In particular, I would welcome oral arguments in these cases so that I could ask questions of the respective counsel to (1) clarify the issues before us regarding the respective positions of the parties or (2) give counsel the opportunity to answer questions about what happened—or did not happen—at the trial level.

¶ 52    Underlying the directives the public employers gave to the plaintiffs in this case— namely, either become fully vaccinated against COVID-19 or, alternatively, if vaccination were unacceptable for moral or medical reasons, undergo regular testing for the virus—is the claim that these directives are based on scientifically sound judgments. In other words, the claim is that the executive branch officers and other public employers issuing these directives may do so because they are scientifically justified based upon the opinions of experts in the appropriate fields. For whatever reason, that underlying assumption seems not to have been challenged at the trial level.

¶ 53    In a factually similar case, Chief Judge Sutton of the Sixth Circuit Court of Appeals wrote the following:

> "It is one thing *** to require masks to minimize dangers to which 'employees are exposed' during the workday and at the workplace. It is quite another to make an across-the-board judgment that the employee is 'strongly encouraged'—emphasis on strongly—to undertake a medical procedure (a vaccination) that cannot be

undone at the end of the workday." *In re MCP No. 165*, 20 F.4th 264, 274 (2021) (Sutton, C.J., dissenting).

¶ 54　　　　One of the lawyers arguing that same case later before the Supreme Court described Judge Sutton's dissent as pointing out that "masks can come off, gloves can come off. *** [But] taking a vaccine is a permanent medical procedure that cannot come off after work is over." Oral Argument Transcript, p. 71.

¶ 55　　　　I have reservations about courts' simply accepting such governmental edicts because some experts—whose opinions have never been presented in open court, subjected to cross-examination, or contested by other experts who may have different views—say those edicts are appropriate. In this regard, I readily concede that judges have no scientific expertise to bring on this subject; however, judges have plenty of experience resolving disputes between experts who do have scientific expertise. In fact, we (or a jury serving as a trier of fact) resolve such disputes all the time. In the last 15 months alone, I personally have been involved in appeals in the following cases in which substantial disputes between experts arose: *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360 (medical experts disagreed about whether the emergency room physician defendant properly treated patient who tests later revealed had a spinal epidural abscess); *Johnson v. Armstrong*, 2021 IL App (4th) 210038 (medical experts disagreed about how a hip replacement surgery was performed); *Arkebauer v. Springfield Clinic*, 2021 IL App (4th) 190967 (in medical malpractice action, plaintiff's expert witness physicians testified defendant breached the standard of care during colonoscopy; defendant's expert witness physicians testified that defendant did not breach the standard of care); *In re Detention of Morris*, 2021 IL App (4th) 190750-U (in sexually violent persons proceeding, State's expert witness disagreed with respondent's expert witness regarding whether respondent was a sexually violent person).

¶ 56    Indeed, the "scientific method" is the process of obtaining scientific consensus through rigorous examination and testing of scientific hypotheses. The scientific consensus is not achieved through untested or unquestioned edicts.

¶ 57    None of the above cases concerning disputes between experts involved fundamental constitutional rights, such as a directive from a governmental agency that an employee be injected, over the employee's objection, with a substance that supposedly expert opinion deems beneficial and unlikely to cause harm. However, past experience has shown that courts have on occasion accepted the views of "experts" to the detriment of both citizens and the reputation of the judiciary.

¶ 58    In fact, two of the most shameful decisions ever rendered by a court in the United States were justified by reliance on the views of "experts" that government agencies accepted to justify clearly unconstitutional conduct, and yet the judiciary did not step in to protect those whose constitutional rights were trammeled. These cases are *Korematsu v. United States* and *Buck v. Bell*.

¶ 59                    A. *Buck v. Bell*

¶ 60    In *Buck v. Bell*, 274 U.S. 200 (1927), at issue was an appeal by a woman who challenged an order that the superintendent of the State Colony for Epileptics and Feeble Minded was to perform an operation upon her for the purpose of making her sterile. The United States Supreme Court described the plaintiff as follows: "Carrie Buck is a feeble-minded white woman who is committed to the state colony above mentioned in due form. She is the daughter of a feeble-minded mother in the same institution, and the mother of an illegitimate feeble-minded child. She was 18 years old at the time of trial." *Id.* at 205.

¶ 61    The Court described a Virginia law, enacted in 1924, that stated, "the health of the patient and the welfare of society may be promoted in certain cases by the sterilization of mental

- 20 -

defectives, under careful safeguard"—namely, that it be performed "without serious pain or substantial danger to life." *Id.* The statute further provided that "whenever the superintendent of an institution like the State Colony is of the opinion that it is in the best interest of the patient and society that an inmate under his care should be sexually sterilized," he may take steps to have the operation performed. *Id.* Those steps included presenting a petition to the board of directors of the institution, with an appeal possible by either the superintendent or the inmate to the local trial court. *Id.*

¶ 62        The Court noted that the contention on appeal was not upon the procedure afforded Buck, but instead that "in no circumstances could such an order be justified." *Id.* The Court rejected Buck's appeal in a decision by Justice Oliver Wendall Holmes, who wrote the following: "It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes." *Id.*

¶ 63        Justice Holmes summed up his conclusion with the following observation: "Three generations of imbeciles are enough." *Id.*

¶ 64        Although what Justice Holmes wrote in *Buck* appears shocking to our modern sensibilities, those words in the context of their time were not shocking or reprehensible. That no doubt accounts for why only one justice dissented, and he did not even bother to write anything to explain why he was dissenting.

¶ 65        My point in mentioning *Buck v. Bell* is to emphasize that in the context of the time in which that opinion was written, what Justice Holmes wrote was consistent with the views of

"experts" on the subject of how the "feeble-minded" should be treated, and, in fact, there was what we might now term a "scientific consensus" on that subject. The "science" was eugenics.

¶ 66 In a 1985 dissent, Justice Thurgood Marshall explained eugenics and its societal effects by writing as follows:

> "Fueled by the rising tide of Social Darwinism, the 'science' of eugenics, and the extreme xenophobia of those years, *leading medical authorities* and others began to portray the 'feeble-minded' as a 'menace to society and civilization ... responsible in a large degree for many, if not all, of our social problems.' " (Emphasis added.) *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 461-62 (1985) (Marshall, J., concurring in part and dissenting in part).

¶ 67 In 2019, Justice Clarence Thomas wrote the following about eugenics in a specially concurring opinion: "By the 1920s, eugenics had become a 'full-fledged intellectual craze' in the United States, particularly among progressives, professionals, and intellectual elites. [Citations.] Leaders in the eugenics movement held prominent positions at Harvard, Stanford, and Yale, among other schools, and eugenics was taught at 376 universities and colleges." *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, __ U.S. __, __, 139 S.Ct. 1780, 1784-85 (2019) (Thomas, J., specially concurring).

¶ 68 B. *Korematsu v. United States*

¶ 69 In *Korematsu v. United States*, 323 U.S. 214, 215-16 (1944), an American citizen of Japanese descent was convicted for remaining in a California city contrary to a civilian exclusion order, which directed that all persons of Japanese ancestry be excluded from that area. The Court affirmed the defendant's conviction, and in doing so, cited approvingly its earlier

decision affirming the internment of American citizens of Japanese ancestry in *Hirabayashi v. United States*, 320 U.S. 81 (1943). The Court quoted from *Hirabayashi* as follows:

> " '[W]e cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that [Japanese ethnic] population, whose number and strength could not be precisely and quickly ascertained. We cannot say that the war-making branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that prompt and adequate measures be taken to guard against it.' " *Id.* at 219 (quoting *Hirabayashi*, 320 U.S. at 99).

¶ 70    In early 1942, President Franklin D. Roosevelt entered the executive order leading to the internment of all persons of Japanese ancestry, including natural-born American citizens, based upon strong advice to do so that he received from the military "experts," as well as then-California Attorney General Earl Warren. The "experts" on the subject of national security on the west coast of the United State had a clear consensus, if not unanimity, that removing all persons of Japanese ancestry from the west coast was prudent and necessary.

¶ 71    Justice Roberts strongly dissented in *Korematsu* because he believed the indisputable facts exhibited a clear violation of constitutional rights. *Id.* at 225 (Roberts, J., dissenting). Justice Roberts wrote the following: "[This is a] case of convicting a citizen as a punishment for not submitting to imprisonment in a concentration camp, based on his ancestry, and solely because of his ancestry, without evidence or inquiry concerning his loyalty and good disposition towards the United States." *Id.* at 226.

¶ 72     My reason for citing *Korematsu*, as was the case with my citing *Buck*, is to point out that "expert opinion" is occasionally wrong and ought not ever be accepted as "received wisdom" just because the experts say so.

¶ 73     And I wish to emphasize that I am not accusing any of the "experts" upon whom the Courts in *Buck* and *Korematsu* relied of acting in bad faith. I have no doubt they truly believed in what they were saying and further believed it was all in the public good. But they were terribly wrong.

¶ 74     That is where the courts come into play. Throughout history, rulers have been issuing edicts that required their subjects to engage in conduct that they do not want to engage in. The rulers required compliance by the threat of force or other dire consequences for the noncompliant. Only relatively recently have courts stepped in to protect citizens from governmental overreach, and generally only those in Western nations, primarily the United States. History shows—and our constitution provides—that the courts are the only true protector and guarantor of the fundamental rights of citizens. They rightly look to the judiciary to curb executive overreach and to protect their fundamental rights.

¶ 75     In the cases I mentioned earlier, *Buck* and *Korematsu*, the courts' failures to live up to those standards was shameful. However, it is not enough to acknowledge those failures; instead, those cases should stand as a clarion call for the judiciary to protect fundamental constitutional rights, even when so-called "experts" deem such rights unworthy of protection because of whatever emergency they claim currently exists.